126 P.3d 402

**STATE of Hawai‘i, Plaintiff–Appellee**

v.

**Aaron C. ESCOBIDO–ORTIZ, also known as Aaron C. Escobido–Ortiz, Jr., Defendant–Appellant**

and

**Ernest David Chavez, Jr., Defendant.**

**No. 25901.**

Intermediate Court of Appeals of Hawai‘i.

Dec. 6, 2005.

As Corrected Dec. 30, 2005.

Stuart N. Fujioka, on the briefs, Honolulu, for Defendant–Appellant.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

LIM, Acting C.J., FOLEY, and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Aaron C. Escobido–Ortiz, also known as Aaron C. Escobido–Ortiz, Jr. (Escobido–Ortiz)[1] appeals from the Judgment entered on June 12, 2003, by the Circuit Court of the First Circuit (circuit court).[2]  Escobido–Ortiz and co-defendant Ernest David Chavez, Jr. (Chavez) were jointly charged in Count 1 of the indictment with Robbery in the First Degree (Robbery I), in violation of Hawaii Revised Statutes (HRS) § 708–840(1)(b)(ii) (1993),[3] for robbing

1.  The record indicates that the Defendant–Appellant's legal name is Aaron Clint Escobido–Ortiz, Jr.

2.  The Honorable Virginia Lea Crandall presided.

3.  Hawaii  Revised  Statutes  (HRS)  § 708–840(1)(b)(ii) (1993) provides:

(1) A person commits the offense of robbery in the first degree if, in the course of committing theft:

a Taco Bell restaurant while armed with a knife. Chavez was charged with an additional count of Robbery I arising out of the same incident. Chavez pleaded no contest to the charges against him and Escobido–Ortiz proceeded to trial. The jury found Escobido–Ortiz guilty as charged. On June 10, 2003, he was sentenced to twenty years' imprisonment.[4]

On appeal, Escobido–Ortiz argues that the circuit court erred in 1) refusing at his first trial to exclude evidence of the positive identification of Escobido–Ortiz's latent fingerprint found inside the Taco Bell safe, an identification made after the jury was selected, and instead declaring a mistrial; 2) denying the request of new defense counsel to continue the rescheduled trial so that counsel could obtain an expert to challenge the scientific validity of fingerprint identification; 3) allowing an expert to testify at the second trial that Escobido–Ortiz's latent fingerprint was found inside the safe; 4) rejecting Escobido–Ortiz's challenge to a juror for cause; and 5) denying Escobido–Ortiz's motion for judgment of acquittal. We affirm.

## BACKGROUND

The following relevant evidence was adduced at Escobido–Ortiz's second trial. For one day, Escobido–Ortiz worked at the Taco Bell located on Kamehameha Highway in Kaneohe (Kaneohe Taco Bell). On June 8, 2000, at 7:30 a.m., he started work at the Kaneohe Taco Bell as a food preparation trainee but left work at about 11:45 a.m. without explanation. He did not return to work.

On June 16, 2000, shortly after 7:00 a.m., two men robbed the Kaneohe Taco Bell. Both men wore sunglasses and one of them also covered his head with a hood and his nose and mouth with a handkerchief. Two female

employees were present. Threatening the use of a knife, the robbers ordered one employee to open the safe and then made both women lie face down on the floor. The robbers left with $3,327.80.

Jeannie Bucio (Bucio),[5] Chavez's girlfriend when the robbery occurred, testified at trial. According to Bucio, on the night before the robbery, she and Chavez met Escobido–Ortiz and went "cruising" in Escobido–Ortiz's car. At that time, Bucio was sixteen years old and had recently escaped from the Hawai'i Youth Correctional Facility (HYCF). Escobido–Ortiz talked to Chavez about robbing a Taco Bell, telling Chavez that Escobido–Ortiz could score "big money" or "thousands." After "cruising" most of the night and stopping at Escobido–Ortiz's house, the three drove in the early morning to a Jack–in–the–Box restaurant next to the Kaneohe Taco Bell. Escobido–Ortiz and Chavez went to "check out" the Kaneohe Taco Bell. When they returned, Escobido–Ortiz asked Bucio to use the Kaneohe Taco Bell bathroom.

Bucio knocked on the employees' entrance to the Kaneohe Taco Bell and asked the female employee who answered for permission to use the bathroom. The employee accompanied Bucio and Chavez to the bathroom behind the restaurant and opened the door. When Bucio left the bathroom, she saw Chavez asking for a job application. Bucio walked back to the car where she was joined by Escobido–Ortiz and Chavez a short time later. They drove to Escobido–Ortiz's house. While there, Escobido–Ortiz took money out of a bag, counted it, and gave some to Chavez and Bucio. The three, accompanied by Escobido–Ortiz's sister, then drove to Waikiki and rented a car.

The owner of Paradise Rent–a–Car, located in Waikiki, testified that on June 16, 2000,

....
(b) The person is armed with a dangerous instrument and:
....
(ii) The person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property.

4. Defendant-Appellant Aaron C. Escobido–Ortiz, also known as Aaron C. Escobido–Ortiz, Jr. (Escobido–Ortiz) was also sentenced to a concurrent term of ten years' imprisonment on an unrelated charge of Robbery in the Second Degree to which he had pleaded guilty.

5. Jeannie Bucio (Bucio), whose maiden name was Jeannie Savea (Savea), was referred to as both "Bucio" and "Savea" during the trial. To avoid confusion, we refer to her as "Bucio."

at about 9:45 a.m., she rented a Camaro convertible to Escobido–Ortiz for two days. The rental charge, which included a $500 deposit, was $823.22. Escobido–Ortiz paid in cash, mostly in one, five, and ten dollar bills. On June 17, 2000, Chavez and Bucio "totaled" the Camaro and were arrested after a failed attempt to assist Bucio's friend to escape from the HYCF. The police traced the Camaro back to Paradise Rent–a–Car and learned that it had been rented to Escobido–Ortiz.

Chavez testified that on June 16, 2000, he was involved in the robbery of the Kaneohe Taco Bell and that he had pleaded guilty to charges relating to that robbery. Chavez acknowledged that another person, whom he refused to name, was involved in the robbery. He specifically denied that Escobido–Ortiz was that other person. Honolulu Police Department (HPD) Detective Madeline Morikawa (Detective Morikawa), however, testified that during an interview on July 12, 2000, Chavez stated that Escobido–Ortiz was the other person involved in the Kaneohe Taco Bell robbery.

The two Kaneohe Taco Bell employees present during the robbery, Assistant Manager Heather Hironaka (Hironaka) and Shift Manager Mailikapu Liptak (Liptak), testified at trial. On the day of the robbery, Liptak and Hironaka each arrived at work at around 7:00 a.m., before the restaurant was open. Liptak answered a knock on the door and a girl asked to use the bathroom. Liptak accompanied the girl to the bathroom and noticed a man standing nearby. A short time later, a man knocked on the door and asked Hironaka for a job application, which she gave him. When the same man returned, Hironaka opened the door and the man handed her the application. Before the door could swing closed, the man kicked it open and entered the Kaneohe Taco Bell along with another man. The other man wore a

hood over his head and a handkerchief over his nose and mouth.

One of the men demanded that Hironaka open the safe, which had a combination lock on its door. Liptak was summoned and ordered to "get on the ground." After Hironaka opened the safe, she joined Liptak face down on the floor. The man closest to Liptak took out a knife, which had a six-inch blade. The other man told the knife-holder that if Liptak moved, to "slit her throat." The knife-holder tapped the knife on the floor in front of Liptak's face. The men took money from the safe and stuffed it in bags. The men then ushered the women into a walk-in refrigerator and told the women to wait two or three minutes before coming out. After waiting as instructed, the women left the refrigerator and Hironaka called the police.[6]

Shortly after the robbery was reported, an HPD evidence specialist recovered three latent fingerprints from the Kaneohe Taco Bell, including a partial latent fingerprint from the interior of the safe. HPD fingerprint technician Stephanie Kamakana (Kamakana), who was qualified as an expert in fingerprint identification, testified that she positively identified the partial latent fingerprint found inside the safe as coming from Escobido–Ortiz's right ring finger. Escobido–Ortiz would not have been authorized to open the safe during his one-day tenure as a Kaneohe Taco Bell employee.

## DISCUSSION

I. The Circuit Court Properly Responded to the Prosecution's Discovery of the Positive Latent Fingerprint Identification During the First Trial By Declaring a Mistrial Rather Than Excluding the Fingerprint Evidence.

A.

In Escobido–Ortiz's first trial, the jury was selected and sworn on September 20, 2001,

---

6. Although Mailikapu Liptak (Liptak) and Heather Hironaka (Hironaka) agreed on the basic sequence of events, their testimony conflicted on which man held the knife and which man uttered the threat to "slit her throat." Neither woman was asked to identify Escobido–Ortiz or Ernest David Chavez, Jr. (Chavez). But, when viewed in the context of the other trial evidence, Liptak's testimony indicated that Escobido–Ortiz uttered the threat and Chavez held the knife. The roles played by the two men were reversed under Hironaka's testimony. Liptak further testified that the man with the knife went through her bag, which formed the basis for the additional robbery charge against Chavez.

and told to report back to court on September 25, 2001, for the start of trial. On September 24, 2001, HPD fingerprint technician Kamakana analyzed a partial latent[7] fingerprint recovered from the interior of the Kaneohe Taco Bell safe and positively identified it as belonging to Escobido–Ortiz. On September 25, 2001, before opening statements and any witness was called, the Deputy Prosecuting Attorney (DPA) notified the circuit court of the positive latent fingerprint identification.

The DPA explained that he had recently directed Detective Morikawa to request a fingerprint analysis from the HPD's identification section because the DPA's file had no record of any analysis being done. On September 24, 2001, the DPA and Detective Morikawa were informed by Kamakana of the positive identification. The DPA also represented that on that same day, he and Detective Morikawa learned for the first time that there had been a prior fingerprint analysis done on July 10, 2001, by HPD fingerprint technician Lori Kaneshiro (Kaneshiro) that found no fingerprint matches. Kaneshiro left the HPD shortly after July 2001 and apparently did not forward her report to Detective Morikawa. The DPA notified Escobido–Ortiz's counsel of Kamakana's positive identification and Kaneshiro's non-identification the day after the DPA learned of them. In order to give Escobido–Ortiz time to review the fingerprint evidence, the DPA asked the circuit court to continue the trial and have the jury return in a few months.

Escobido–Ortiz's counsel argued that the court should exclude evidence of the positive fingerprint identification because it was provided to the defense so late. He also criticized Plaintiff–Appellee State of Hawai'i (the State) for failing to disclose earlier the non-identification by Kaneshiro. Escobido–Ortiz's counsel stated that if the court would

not exclude the positive fingerprint identification, he would be moving, in the alternative, for a mistrial.

The circuit court found that there was no "intentional withholding" and "no bad faith or misconduct" with respect to the State's disclosure of the fingerprint evidence. The court therefore declined to exclude the fingerprint evidence. In weighing the choice between a continuance and a mistrial, the court found that a continuance would be impractical and granted Escobido–Ortiz's alternative motion for a mistrial. The court noted that Escobido–Ortiz did not have a fair opportunity to ask prospective jurors about fingerprint evidence and that keeping the jury intact would be difficult given the jurors' potential scheduling conflicts.

### B.

On appeal, Escobido–Ortiz argues that the circuit court erred by failing to exclude evidence of the positive latent fingerprint identification at the first trial because the evidence was not disclosed until after the jury had been selected. He contends that the court should have forced the State to proceed without this evidence instead of declaring a mistrial. We disagree.

The State promptly disclosed Kamakana's positive latent fingerprint identification to the defense after Kamakana conducted her analysis and reported it to the State. Escobido–Ortiz cites no discovery rule or pre-trial order that was violated by the timing of the State's disclosure of the positive identification. Rule 16(b) of the Hawai'i Rules of Penal Procedure (HRPP) requires the State to *disclose* "material and information within the prosecutor's possession or control"; it does not require the prosecution to *discover* relevant evidence by a particular deadline.[8] Indeed, HRPP Rule 16(e)(2) con-

---

**7.** Fingerprints left behind at a crime scene are called "latent" from the Latin *lateo*, "to lie hidden," because they often are not visible to the naked eye until dusted with powder or revealed by other means. *United States v. Mitchell*, 365 F.3d 215, 220–21 (3d Cir.2004). Latent fingerprints recovered from a crime scene generally are not full fingerprints, but are fragments of fingerprints, which may be distorted by smudg-

ing or by artifacts that appear to be part of the fingerprint but are not. *Id.* at 220–21.

**8.** Rule 16(b) of the Hawai'i Rules of Penal Procedure (HRPP) provides in relevant part as follows:
    (b) **Disclosure by the prosecution.**
      (1) DISCLOSURE OF MATTERS WITHIN PROSECUTION'S POSSESSION. The prosecutor shall disclose to the defendant or the

templates that a prosecutor may discover and disclose relevant evidence during trial.[9] By promptly disclosing the positive latent fingerprint identification upon learning of Kamakana's analysis, the prosecution complied with its HRPP Rule 16 obligations with respect to that evidence.

The circuit court properly opted to grant Escobido–Ortiz's alternative motion for a mistrial rather than exclude the highly probative positive latent fingerprint identification. The State had not yet called any witness. The mistrial gave Escobido–Ortiz additional time to review both Kamakana's positive latent fingerprint identification and to follow up on Kaneshiro's non-identification. We are unable to detect any abuse of discretion in the circuit court's decision to grant the mistrial. *State v. Wilmer*, 97 Hawai'i 238, 243, 35 P.3d 755, 760 (2001) (stating that the trial court's declaration of a mistrial is reviewed for abuse of discretion).

■ Escobido–Ortiz also complains about the State's failure to timely disclose Kaneshiro's analysis conducted in July 2001, which found no fingerprint matches. Escobido–Ortiz, however, concedes that the "late production of the Kaneshiro report, by itself, could have been cured by continuance or even disclosure." He further concedes that the late disclosure was "inadvertent." Given the court's declaration of a mistrial, Escobido–Ortiz suffered no prejudice from the late disclosure of Kaneshiro's report.

II. The Circuit Court Did Not Abuse Its Discretion in Denying Escobido–Ortiz's Motion to Continue the Rescheduled Trial.

In conjunction with declaring a mistrial, the circuit court granted Escobido–Ortiz's request that the HPD be ordered to give an expert hired by the defense access to the fingerprint evidence. The court also rescheduled the trial for the week of October 29, 2001. The trial was subsequently continued several times at the request of Escobido–Ortiz. On May 2, 2002, the circuit court appointed new counsel to represent Escobido–Ortiz after the Public Defender's Office moved to withdraw as Escobido–Ortiz's counsel. Trial was rescheduled again, this time for the week of August 5, 2002.

At a trial call held on July 30, 2002, Escobido–Ortiz's new counsel orally moved to continue the trial based on his need to challenge the positive fingerprint identification. Counsel stated that his challenge was not based on "whether it's my client's print or not," but on "whether the whole science of fingerprint analysis is valid." Counsel explained that he had been busy preparing for another trial and needed time to obtain a witness to support his challenge to the validity of fingerprint analysis. The State opposed the request, arguing that the defense had ample opportunity to hire an expert or otherwise pursue matters relating to the positive latent fingerprint identification. The circuit court denied Escobido–Ortiz's motion.

■ On appeal, Escobido–Ortiz argues that the circuit court erred in denying his motion for a continuance, which he claims was necessary to permit his new counsel to find an expert to demonstrate the unreliability of fingerprint identification. The trial court's decision to grant or deny a continuance is reviewed for abuse of discretion. *State v. Ahlo*, 79 Hawai'i 385, 395, 903 P.2d 690, 700 (App.1995).

---

9. HRPP Rule 16(e)(2) provides:

    (2) CONTINUING DUTY TO DISCLOSE. If subsequent to compliance with these rules or orders entered pursuant to these rules, a party discovers additional material or information which would have been subject to disclosure pursuant to this Rule 16, that party shall promptly disclose the additional material or information, and *if the additional material or information is discovered during trial,* the court shall also be notified. (Emphasis added.)

defendant's attorney the following material and information within the prosecutor's possession or control:

    . . . .

    (iii) any reports or statements of experts, which were made in connection with the particular case or which the prosecutor intends to introduce, or which are material to the preparation of the defense and are specifically designated in writing by defense counsel, including results of physical or mental examinations and of scientific tests, experiments, or comparisons[.]

Escobido–Ortiz received notice of the positive latent fingerprint identification on September 25, 2001. Both Escobido–Ortiz's prior counsel and his new counsel had sufficient time to search for an expert. Significantly, in moving for a continuance, Escobido–Ortiz's new counsel gave the circuit court no assurance that he could find an expert to provide the testimony he sought. We conclude that Escobido–Ortiz's ability to locate the desired expert was speculative and that the circuit court properly exercised its discretion in denying the motion. *See State v. Lee,* 9 Haw.App. 600, 604, 856 P.2d 1279, 1282 (1993) (stating that a motion for continuance based on the unavailability of a witness must aver that substantial favorable evidence would be tendered by the witness).

III.  The Circuit Court Properly Admitted Expert Testimony on the Positive Latent Fingerprint Identification During the Second Trial.

A.

Prior to the second trial, Escobido–Ortiz moved *in limine* to exclude evidence of Kamakana's positive latent fingerprint identification pursuant to Hawaii Rules of Evidence (HRE) Rule 702. Relying primarily on the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Escobido–Ortiz contended that Kamakana's expert testimony was not based on a theory and methodology that were sufficiently reliable to justify its admission. After a pretrial hearing, at which Kamakana testified, the circuit court denied Escobido–Ortiz's motion. The court later filed a written order containing the following findings of fact and conclusions of law:

1.  On July 24, 2001, Stephanie Kamakana, Fingerprint Examiner for the Honolulu Police Department, was requested by [the] Deputy Prosecuting Attorney . . ., to examine the Known Inked Prints of Defendant and compare them to Latent Prints covered [sic] by Evidence Technician Dan Shinozuka in the above-related matter.

2.  Stephanie Kamakana, being qualified in excess of a hundred times by Hawaii State Courts as an expertn [sic] in Fingerprint Identification and Examinations, completed the fingerprint comparison and concluded that the Defendant's known prints positively matched the latent prints recovered at the scene of the alleged crime.

3.  Stephanie Kamakana testified that the underlying principle of Fingerprint Identification states that no two persons can share the same identical fingerprint.

4.  Ms. Kamakana further testified that the methodology she applies during the finger print [sic] examination is a valid procedure and technique used by [sic] not only by herself, but by Fingerprint examiners in the relevant Fingerprint Examination and Identification Community.

5.  On this particular occasion, Ms. Kamakana properly applied all generally accepted techniques in conducting her examination on above-mentioned prints.

6.  The Court finds that under the standards setforth [sic] in *State v. Montalbo,* 73 Haw. 130, 136, 828 P.2d 1274, 1279 (1992), and *State v. Ito,* 90 Hawai'i 225, 978 P.2d 191 (1999), that the State has met its burden of proving, 1) the validity of the underlying principles; 2) the validity of the underlying technique employed; and 3) the proper application of the techniques on the instant occasion by Stephanie Kamakana.

IT IS HEREBY ORDERED that the aforesaid motion be and the same is hereby denied.

At trial, Kamakana was qualified as an expert in the field of fingerprint examinations.[10] She positively identified the partial latent fingerprint recovered from within the

---

**10.** Stephanie Kamakana (Kamakana) testified about her qualifications as a fingerprint examiner both at the hearing on Escobido–Ortiz's motion *in limine* and at trial. Her testimony revealed that she had been a fingerprint identification technician for the Honolulu Police Department (HPD) for fourteen years; that she was the most senior person holding that position; that she had received extensive training in the classification of fingerprints and identification of latent fingerprints, including over 200 hours of instructional classes given by the Federal Bureau of Investigation (FBI); and that she had been qualified as a fingerprint expert over one hundred times in both state and federal courts in Hawaii.

Kaneohe Taco Bell safe as that of Escobido–Ortiz's right ring finger. Kamakana based her identification, among other things, on fourteen matching points of identification that she found between the latent fingerprint and Escobido–Ortiz's known fingerprint. She stated that under her method of analysis, there was no minimum number of points of identification a fingerprint examiner was required to find before making a positive identification.[11] Kamakana acknowledged that certain foreign countries required more than fourteen points of identification for a positive identification, but she indicated that the procedures she used were accepted within the relevant scientific community in the United States.

When questioned about Kaneshiro's non-identification of the same latent fingerprint, Kamakana testified that Kaneshiro was far less experienced and had only worked as a fingerprint examiner for a year before examining the latent fingerprint. Kamakana testified that Kaneshiro's failure to make a positive identification could have been caused by Kaneshiro not orienting the partial latent fingerprint in the same position as the known fingerprint, such that the latent fingerprint was being viewed sideways or upside down. Kamakana conceded on cross-examination, however, that she did not know the actual reason for Kaneshiro's non-identification.

### B.

On appeal, Escobido–Ortiz contends that the circuit court erred in admitting Kamakana's expert testimony that she positively identified the latent fingerprint recovered from inside the safe as Escobido–Ortiz's fingerprint. In particular, Escobido–Ortiz argues that the methods and procedures used by fingerprint examiners to positively identify a latent fingerprint are not sufficiently reliable to make latent fingerprint identification the proper subject of expert testimony.

The test for the admission of expert testimony is set forth in HRE Rule 702:

**Rule 702 Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

The Hawai'i Supreme Court has held that "the touchstones of admissibility for expert testimony under HRE Rule 702 are relevance and reliability." *State v. Vliet,* 95 Hawai'i 94, 106, 19 P.3d 42, 54 (2001). Escobido–Ortiz does not dispute the relevancy of Kamakana's testimony. Evidence that Escobido–Ortiz's fingerprint was found inside the Kaneohe Taco Bell safe clearly assisted the jury in determining a fact in issue—whether Escobido–Ortiz had participated in the robbery. Instead, Escobido–Ortiz's challenge to Kamakana's expert testimony centers on the reliability prong of HRE Rule 702.

The trial court has the discretionary authority to determine whether expert testimony is sufficiently reliable to warrant its admission under HRE 702, and the court's reliability determination is reviewed for abuse of discretion. *Id.* at 107, 19 P.3d at 55. The Hawai'i Supreme Court has been hesitant to establish categories of factors, required to be applied in every case, that would unnecessarily limit the scope of the trial court's exercise of its discretion. *Id.* at 107–10, 19 P.3d at 55–58. Rather, the Hawai'i Supreme Court has endorsed a flexible approach that grants the trial court "broad latitude ... in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 110, 19 P.3d at 58 (internal citation and quotation marks omitted).

In *State v. Montalbo,* 73 Haw. 130, 140, 828 P.2d 1274, 1280–81 (1992), the Hawai'i Supreme Court did, however, identify several factors the trial court should consider

---

11. Like the HPD, the FBI does not require its fingerprint examiners to find a minimum number of points of identification before making a positive identification. *Mitchell,* 365 F.3d at 222.

in determining whether proffered scientific evidence satisfies the reliability prong of HRE Rule 702. These factors are whether:

[1.] the underlying theory is generally accepted as valid;

[2.] the procedures used are generally accepted as reliable if performed properly; [and]

[3.] the procedures were applied and conducted properly in the present instance.

*Id.*

In *Daubert,* 509 U.S. at 579, 113 S.Ct. 2786, the United States Supreme Court construed Federal Rules of Evidence (FRE) Rule 702, on which HRE Rule 702 was modeled. *Daubert* held that prior to admitting expert testimony under FRE Rule 702, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592–93, 113 S.Ct. 2786. *Daubert* identified the following four nonexclusive factors as relevant to this inquiry:

[1.] Whether a theory or technique ... can be (and has been) tested;

[2.] Whether it has been subjected to peer review and publication;

[3.] Whether in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and

[4.] Whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149–50, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (internal quotation marks omitted). Although the Hawai'i Supreme Court has not adopted the *Daubert* test in construing HRE Rule 702, it has found the *Daubert* factors instructive. *Vliet,* 95 Hawai'i at 105, 19 P.3d at 53.[12]

The factors identified in *Montalbo* and *Daubert,* while not definitive, provide useful guidance in assessing whether the circuit court properly exercised its discretion in determining that Kamakana's expert testimony on the positive latent fingerprint identification was sufficiently reliable to warrant its admission. This is the inquiry to which we now turn.

### C.

Escobido–Ortiz does not dispute the basic theory on which fingerprint identification is based—that no two people have the same fingerprint and that a person's fingerprints are permanent and thus subject to comparison over time. He instead argues that the methodology used by fingerprint examiners lacks the standardization or empirical criteria necessary to make latent fingerprint identification reliable under the factors set forth in *Montalbo* and *Daubert.* We disagree.

Expert testimony on fingerprint identification has long been accepted as reliable and admissible by the courts. *United States v. Crisp,* 324 F.3d 261, 266 (4th Cir.2003). *Daubert,* however, spawned new debate over whether latent fingerprint identification is sufficiently reliable to qualify as a proper subject for expert testimony. In *United States v. Mitchell,* 365 F.3d 215 (3d Cir.2004), the United States Court of Appeals for the Third Circuit did an exhaustive analysis of whether expert testimony on latent fingerprint identification satisfied the *Daubert* factors and concluded that it did.

Similarly, in *United States v. Crisp,* 324 F.3d at 265–70, the United States Court of Appeals for the Fourth Circuit considered the admissibility of expert testimony on latent palm print identification, which the court treated as being indistinguishable from latent fingerprint identification. The defendant, Leroy Crisp (Crisp), challenged the admissibility of an expert's identification of his latent palm print on the same grounds raised by Escobido–Ortiz. *Id.* at 266. In rejecting

---

**12.** The trial court need not determine whether the proffered expert testimony should be characterized as scientific, technical, or otherwise specialized knowledge because the reliability requirement of Hawaii Rules of Evidence (HRE) Rule 702 applies to all expert testimony. *State v. Vliet,* 95 Hawai'i 94, 108, 19 P.3d 42, 55 (2001); *see Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Crisp's arguments, the court provided the following analysis:

> Crisp today advocates the wholesale exclusion of a long-accepted form of expert evidence. Such a drastic step is not required of us under *Daubert,* however, and we decline to take it. The *Daubert* decision, in adding four new factors to the traditional "general acceptance" standard for expert testimony, effectively opened the courts to a broader range of opinion evidence than was previously admissible. Although *Daubert* attempted to ensure that courts screen out "junk science," it also enabled the courts to entertain new and less conventional forms of expertise. As the Court explained, the addition of the new factors would put an end to the "wholesale exclusion [of expert testimony based on scientific innovations] under an uncompromising 'general acceptance' test." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469.

> The touchstones for admissibility under *Daubert* are two: reliability and relevancy. *See id.* at 589, 597, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469; *see also Kumho,* 526 U.S. at 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 ("The objective of [*Daubert's* gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony."). Under *Daubert,* a trial judge need not expend scarce judicial resources reexamining a familiar form of expertise every time opinion evidence is offered. In fact, if a given theory or technique is "so firmly established as to have attained the status of scientific law," then it need not be examined at all, but instead may properly be subject to judicial notice. *Daubert,* 509 U.S. at 592 n. 11, 113 S.Ct. 2786, 125 L.Ed.2d 469.

> While the principles underlying fingerprint identification have not attained the status of scientific law, they nonetheless bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well. *See [United States v.] Havvard,* 260 F.3d [597,] at 601 [(7th Cir. 2001)] (noting lower court's observation that fingerprint analysis has enjoyed "100 years of successful use in criminal trials"); *[United States v.] Llera Plaza,* 188

F.Supp.2d [549,] at 563, 572–76 [(E.D.Pa. 2002)] (describing longstanding consensus in expert community as to reliability of fingerprint identification process in holding admissible expert fingerprint identification evidence); *see also [United States v.] Hernandez,* 299 F.3d [984,] at 991 [(8th Cir. 2002)] (upholding admissibility of fingerprint identification evidence one year ago); *[People v.] Jennings,* [252 Ill. 534,] 96 N.E. [1077,] at 1083 [(1911)] (upholding admissibility of fingerprint identification evidence ninety-two years ago). Put simply, Crisp has provided us no reason today to believe that this general acceptance of the principles underlying fingerprint identification has, for decades, been misplaced. Accordingly, the district court was well within its discretion in accepting at face value the consensus of the expert and judicial communities that the fingerprint identification technique is reliable.

In addition to a strong expert and judicial consensus regarding the reliability of fingerprint identification, there exist the requisite "standards controlling the technique's operation." *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786, 125 L.Ed.2d 469. As Brannan testified, while different agencies may require different degrees of correlation before permitting a positive identification, fingerprint analysts are held to a consistent "points and characteristics" approach to identification. Analysts are also consistently subjected to testing and proficiency requirements. Brannan's testimony is entirely in keeping with the conclusions of the post-*Daubert* courts that uniform standards have been established "through professional training, peer review, presentation of conflicting evidence and double checking." *Rogers,* 26 Fed.Appx. 171[, 2001 WL 1635494, *1] (4th Cir.2001); *see also, e.g., Llera Plaza,* 188 F.Supp.2d at 566–71 (detailing development of identification criteria and holding that "standards which control the opining of a competent fingerprint examiner are sufficiently widely agreed upon to satisfy *Daubert* requirements"); *cf. Havvard,* 260 F.3d at 599 (holding that, while uniform standards may not exist, "the unique nature of finger-

prints is counterintuitive to the establishment of such a standard").

Furthermore, in *Havvard*, the Seventh Circuit determined that *Daubert's* "known error rate" factor was satisfied because the expert had testified that the error rate for fingerprint comparison was "essentially zero." 260 F.3d at 599. Similarly, and significantly, Brannan testified here to a negligible error rate in fingerprint identifications.

In sum, the district court heard testimony to the effect that the expert community has consistently vouched for the reliability of the fingerprinting identification technique over the course of decades. That evidence is consistent with the findings of our sister circuits, and Crisp offers us no reason to believe that the court abused its discretion in crediting it. The district court also heard evidence from which it was entitled to find the existence of professional standards controlling the technique's operation. Those standards provide adequate assurance of consistency among fingerprint analyses. Finally, the court heard testimony that fingerprint identification has an exceedingly low rate of error, and the court was likewise within its discretion in crediting that evidence. While Crisp may be correct that further research, more searching scholarly review, and the development of even more consistent professional standards is desirable, he has offered us no reason to reject outright a form of evidence that has so ably withstood the test of time.

Finally, even if we had a more concrete cause for concern as to the reliability of fingerprint identification, the Supreme Court emphasized in *Daubert* that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469. Ultimately, we conclude that while further research into fingerprint analysis would be welcome, "to postpone present in-court utilization of this bedrock forensic identifier pending such research would be to make the best the enemy of the good." *Llera Plaza*, 188 F.Supp.2d at 573 (internal quotation omitted).

*Id.* at 268–70.

The reasoning and analysis of *Crisp* and *Mitchell* are persuasive. We note that since *Daubert* was decided, law review articles[13] have been published that question whether expert testimony on latent fingerprint identification satisfies the *Daubert* factors. The courts, however, both before and after *Daubert*, are virtually unanimous in holding that such expert testimony is reliable and admissible.

During the hearing on Escobido–Ortiz's motion *in limine* to exclude the positive latent fingerprint identification, the trial court heard testimony from Kamakana that fingerprint technicians at the HPD receive at least three years of training, which includes learning how to classify fingerprints, learning about their patterns and shapes, and giving them specific numerical values. This training takes place before the technicians are allowed to start analyzing crime-scene fingerprints. Kamakana stated that the theory behind fingerprint identification—that fingerprints "are unique and permanent, and very specific to that particular person"—has been validated by empirical testing and has been accepted worldwide. She described her method of identifying a latent fingerprint as based on an examination of the fingerprint's contour or shape, its characteristics, the structure, width, and edges of its individual ridges, and other details such as pores. She further testified that the method and system of fingerprint identification she uses has been accepted by practitioners in all 50 states and in other "first- and second-world countries."

Kamakana noted that the Hawai'i Criminal Justice System maintains an automated fingerprint indexing system (AFIS) that permits a comparison between latent fingerprints and known fingerprints. Kamakana stated that there are over 70,000 fingerprints

---

**13.** *E.g.*, Jessica M. Sombat, *Latent Justice: Daubert's Impact on the Evaluation of Fingerprint Identification Testimony*, 70 Fordham L.Rev. 2819 (2002); Jennifer L. Mnookin, *Fingerprint Evidence in an Age of DNA Profiling*, 67 Brook. L.Rev. 13, 57–70 (2001).

in the AFIS system, which has been used in Hawai'i since 1990. Kamakana testified that to her knowledge, the AFIS system had not revealed two people sharing the same fingerprint. Kamakana further testified that it was the HPD's practice to have a positive latent fingerprint identification independently verified by another fingerprint technician. In this case, Kamakana's positive identification of Escobido–Ortiz's latent fingerprint was verified by HPD fingerprint technician Gloria Sua. Kamakana stated that she has never heard of instances in which a fingerprint examiner had made an erroneous positive identification. In addition, there has never been a time when a positive fingerprint identification she made was later proved to be wrong.

■ We conclude that the circuit court properly admitted Kamakana's expert testimony that she positively identified the latent fingerprint as belonging to Escobido–Ortiz. The evidence presented at the hearing on Escobido–Ortiz's motion *in limine* established that Kamakana's expert testimony was reliable under the factors set forth in *Montalbo*. The circuit court was well within its discretion in finding that Kamakana's expert testimony satisfied the reliability prong of HRE Rule 702. We take judicial notice, based on the overwhelming case law from other jurisdictions, that the theory underlying latent fingerprint identification is valid and that the procedures used in identifying latent fingerprints, if performed properly, have been widely accepted as reliable. *Vliet,* 95 Hawai'i at 112, 19 P.3d at 60 (concluding that judicial notice regarding the validity of scientific principles and the reliability of scientific tests may be based on case law from other jurisdictions); *State v. Ito,* 90 Hawai'i 225, 242–43, 978 P.2d 191, 208–09 (1999) (same). The circuit court's decision to admit Kamakana's expert testimony was in accor-

dance with the consensus of courts in other jurisdictions. *Crisp,* 324 F.3d at 266–69.

Certainly, the jury was not required to accept uncritically Kamakana's expert testimony. Escobido–Ortiz was free to and did attack Kamakana's opinion regarding the positive latent fingerprint identification at trial. Escobido–Ortiz's counsel pointed out the non-identification by Kaneshiro and questioned whether Kamakana's fourteen points of identification were sufficient for a positive identification, whether the points of identification Kamakana claimed were valid, and whether the latent fingerprint was clear enough to permit a meaningful comparison. Escobido–Ortiz's attack on Kamakana's expert testimony, however, went to the weight of Kamakana's testimony and not its admissibility. In ordinary cases, the proper means of attacking an expert's positive fingerprint identification is through rigorous cross-examination or presentation of an opposing expert to challenge the positive identification, not the wholesale exclusion of a reliable methodology.[14] *United States v. Salim,* 189 F.Supp.2d 93, 101 (S.D.N.Y.2002). As noted in *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." [15]

## IV. The Circuit Court Properly Rejected Escobido–Ortiz's Challenge to a Prospective Juror for Cause.

During jury selection, in response to the court's questions, a prospective juror notified the parties that she had been a victim of crime and had twice been a witness at trial. The juror explained that about six years ago she had been robbed at gun point while working as a bank teller. She testified in her capacity as a teller in the robbery case and also in a case in which a person had

14. We do not rule out the possibility that an unusual case may arise in which the trial court may act within its discretion in excluding a qualified expert's latent fingerprint identification where there are strong grounds to question the reliability of the expert's particular identification.

15. The defense can call its own fingerprint expert to dispute a positive fingerprint identification by

the prosecution's expert. In Escobido–Ortiz's case, the trial court denied his counsel's request for a continuance to obtain an expert to attack the scientific validity of latent fingerprint identification. The record does not disclose whether Escobido–Ortiz's former or new counsel sought a fingerprint expert to challenge the particular identification made by Kamakana.

presented her with a stolen check. The juror stated that nothing about her experience as a crime victim or witness would affect her ability to be fair and impartial.

Counsel for Escobido–Ortiz was given the opportunity to question the juror at side bar. Counsel elicited details about the robbery of which the juror had been a victim, including that the robbery had occurred six years ago while the juror was a bank teller in California; that one of the two robbers that entered the bank pointed a gun at her; that no verbal threats had been made; that she cooperated in helping the robbers get money out of the drawers; and that she did not seek or receive counseling after the robbery. The following colloquy then took place between defense counsel and the prospective juror:

> [DEFENSE COUNSEL]: Now what I'm asking you to do—and it's hard, but I'm concerned that as you hear the evidence in this case that people were robbed and at a commercial establishment and that a weapon was used, not a gun but a knife, that may evoke certain sympathies for you towards the people that were—the victims of the robbery—
>
> A JUROR: Right.
>
> [DEFENSE COUNSEL]:—and either passion or prejudice against my client. Do you think that's likely to happen?
>
> A JUROR: I don't think so honestly. It was a really long time ago, and, like I said, it wasn't something that I had to seek counseling for or that I really feel that scarred me, you know, or I haven't been able to get over it. It was just something that happened and something that honestly working as a teller, especially in California, you kind of almost expect to happen.
>
> [DEFENSE COUNSEL]: So as you stand here today are you absolutely certain that—here is my concern, that as this case—I mean you may be able to say that now because you can kind of be detached, you haven't seen any evidence and things yet, but my concern is as this case develops and if these witnesses testify and they are females and they start crying and become emotional, that that may start kind of pressing buttons within you that may cause you then to not maintain the neutral-

ity to be fair and impartial that the law requires—

> A JUROR: Right.
>
> [DEFENSE COUNSEL]:—that you are to give my client. As you stand here, can you be sure that you are going to be able to maintain that composure and not start feeling that sympathy for the victims and perhaps prejudice, bias against my client? Can you be certain of that?
>
> A JUROR: As I'm standing here, I can tell you that I'm not going to experience any prejudices and if I start to, I will do everything I can to maintain impartially at this and be fair. That's all.

Although acknowledging that the prospective juror had given "the right answers," defense counsel challenged the juror for cause because of the similarity between the juror's robbery and Escobido–Ortiz's case. The circuit court denied the challenge for cause, finding that "the juror can be fair and impartial." After Escobido–Ortiz used a peremptory challenge to excuse the juror, Escobido–Ortiz asked for an additional peremptory challenge on the ground that the juror should have been excused for cause. The court denied this request.

■ We reject Escobido–Ortiz's claim that the circuit court abused its discretion in refusing to excuse the prospective juror for cause. From this it follows that we likewise reject Escobido–Ortiz's claim that the court erred in denying him an additional peremptory challenge. The prospective juror candidly disclosed her prior experience and unequivocally stated that she could be fair and impartial. The juror was robbed six years ago and she denied being scared or suffering any psychological damage, noting that as a bank teller in California, the robbery was something "you kind of almost expect to happen." The circuit court heard the juror's answers and had a full opportunity to assess her demeanor and credibility. Contrary to Escobido–Ortiz's contention, we see no reason to imply bias. We do not regard the juror's prior experience as a robbery victim to be such an extreme situation that juror bias should be implied. *See State v. Kauhi*, 86 Hawai'i 195, 200, 948 P.2d 1036, 1041 (1997).

### V. There Was Sufficient Evidence to Support Escobido–Ortiz's Conviction.

Escobido–Ortiz claims that there was insufficient evidence to prove that he was one of the robbers. This claim has no merit in light of Bucio's testimony, evidence that Escobido–Ortiz's fingerprint was found inside the Kaneohe Taco Bell safe, and other compelling circumstantial evidence of Escobido–Ortiz's guilt. Although Escobido–Ortiz correctly notes that no eyewitness placed him inside the Kaneohe Taco Bell, eyewitness testimony is not a prerequisite for a valid conviction. When viewed in the light most favorable to the prosecution, there was ample and substantial evidence to support Escobido–Ortiz's conviction. *State v. Tamura,* 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981).

### CONCLUSION

We affirm the June 12, 2003, Judgment filed by the Circuit Court of the First Circuit.

