Filed 9/26/13  P. v. Jones CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RONALD A. JONES,<br><br>    Defendant and Appellant. | B241140<br><br>(Los Angeles County<br>Super. Ct. No. MA054661) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hayden Zacky, Judge.  Affirmed.

Landra E. Rosenthal, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Ronald A. Jones, appeals his conviction for first degree murder (Pen. Code, § 187).[1] He was sentenced to state prison for 25 years to life.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *The crime scene evidence.*

Earl Cager testified his family owned Cager Clothing, a store in Palmdale, on Q-6 near a barber shop. One of the store's employees was Annton Berry. On October 23, 2006, Earl and his mother went to the store to pick up some T-shirts. Berry was the only person working in the store that day. At the rear of the store, Earl saw a body with a plastic trash bag over its head. Earl ran and told his mother, who called 911. Earl testified Berry's silver Impala had been parked outside the store when they arrived, but by the time they had parked, the Impala was gone.

When the police arrived they found Berry's body. The autopsy showed Berry had died from a gunshot wound to the head. Autopsy photographs showed he had also sustained lacerations, a black eye, and bruising on his arm and knee, suggesting he had been in a fight and had been wrestled to the ground. Berry's Impala, his wallet and his checkbook were subsequently found at other locations.

Police recovered five latent fingerprints from the plastic bag which had been placed over Berry's head.

2. *Witness statements.*

Alfonso H. testified he was acquainted with defendant Jones as someone who socialized with Alfonso's nephews, Andre and Arthur. Alfonso told police that

---

[1]    All further references are to the Penal Code unless otherwise specified.

2

one morning before Halloween in 2006, he, his nephews and Jones were together. Jones asked Arthur and Andre to help him rob a clothing store on Q-6 near a barber shop. Jones wanted to rob this particular store because there would only be one person working there. After Arthur and Andre refused Jones's request, Jones left. Alfonso spent the rest of the day with his nephews. That afternoon, he and Arthur saw police roadblocks near the store Jones had talked about robbing. Alfonso and Arthur later read in the newspaper that a man with a bag over his head had been killed in the store that day.

Two days after the killing, Arthur overheard Jones talking about the robbery, saying the victim had pleaded for his life and Jones had had to wrestle him to the ground.

3. *Fingerprint evidence.*

Los Angeles County Deputy Sheriff Craig Johnson testified he worked as a fingerprint examiner. He developed five latent fingerprint cards from the plastic bag on Berry's head. A "latent fingerprint" is an unknown or unidentified print, whereas an "exemplar" is a known example of a person's fingerprints.

The Sheriff's Department uses an Automated Fingerprint Identification System which allows a database search of latent fingerprints. This computerized system generates a list of likely match candidates. Based on a photograph of the latent prints taken from the plastic bag, the system hit on Jones as a potential match. Johnson then manually compared the prints and confirmed the latent prints from the bag belonged to Jones. Johnson testified one of the latent prints contained a portion of Jones's right little finger, and another contained a portion of Jones's left ring finger. Johnson's initial comparison was then checked by two other fingerprint analysts, who both concluded the latent prints matched Jones's exemplar.

On the day of Johnson's testimony he fingerprinted Jones, creating a new exemplar. Johnson then compared the latent prints from the bag to the new exemplar and, once again, determined there was a match.

Jones did not present any evidence.

## CONTENTION

Jones contends the trial court erred by refusing to hold a *Kelly-Frye* hearing before admitting Johnson's fingerprint testimony. This claim is meritless.

1. *Proceedings below*.

Defense counsel filed a motion to exclude the fingerprint evidence on *Kelly-Frye*[2] grounds. The motion cited a 2009 report from the National Academy of Sciences and an unpublished 2008 Maryland trial court ruling, and argued that, due to a recent change in the scientific community's view of fingerprint analysis reliability, there was no basis on which Johnson could have concluded the latent prints belonged to Jones to the exclusion of all other people.

The trial court denied the motion, saying: "[F]ingerprint analysis is not a new scientific technique. The California Supreme Court has repeatedly held over a span of 57 years that fingerprints are the strongest evidence of identity of a person. . . . [T]hese cases appear to have been written prior to D.N.A. but there's a number of cases that stand for that proposition. [¶] In addition . . . the defense is more than able to call a fingerprint witness if they'd like to present contrary evidence that perhaps the prints at the crime scene did not belong to Mr. Jones. And if [defense counsel] has such a witness, I am sure he will call that witness. But I don't believe there's any reason to conduct a *Kelly-Frye* hearing. This is not new scientific evidence. It's generally accepted in the scientific community as well.

---

[2]  The *Kelly/Frye* test for admitting the results of new scientific techniques originally referred to *People v. Kelly* (1976) 17 Cal.3d 24, 30-32 and *Fyre v. United States* (D.C.Cir. 1923) 293 F. 1013. "[F]ollowing the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc*. (1993) 509 U.S. [579] . . , holding that *Frye* was abrogated by rule 702 of the Federal Rules of Evidence . . . we conclude that the *Kelly/Frye* formulation (or now more accurately, the *Kelly* formulation) should remain a prerequisite to the admission of expert testimony regarding new scientific methodology in this state." (*People v. Leahy* (1994) 8 Cal.4th 587, 591.)

Historically, fingerprints have been presented in criminal cases throughout this state and throughout the entire country, if not the world. So the motion is denied."

2. *Standard of review.*

Jones's *Kelly-Frye* challenge to Johnson's testimony is "a decision . . . which concerns the admissibility of evidence, [and is therefore] subject to review for abuse of discretion. This is especially so when, as here, the evidence comprises expert opinion testimony. [Citation.] Underlying determinations, of course, are scrutinized pursuant to the test appropriate thereto. The conclusion that a certain legal principle, like the *Kelly-Frye* rule, is applicable or not in a certain factual situation is examined independently. [Citation.]" (*People v. Rowland* (1992) 4 Cal.4th 238, 266.)

3. *Discussion*.

Jones contends his conviction must be reversed because the trial court refused to hold a *Kelly-Frye* hearing on the reliability of fingerprint evidence. This claim is meritless.

a. *No need to hold a <u>Kelly-Frye</u> hearing.*

Jones contends the trial court "erroneously concluded that fingerprint evidence was generally accepted in the scientific community. While fingerprint evidence may still be accepted in the legal community, and particularly in connection with criminal cases, recent developments have shown that fingerprint evidence is not in fact, at this time, generally accepted in the scientific community. There has clearly been shown that a basis now exists to question the hitherto ordinarily unchallenged acceptance of testimony by so-called fingerprint experts."

Jones bases this claim on a 2009 report issued by the National Research Council [N.R.C.] of the National Academy of Sciences, "*Strengthening Forensic*

5

*Science in the United States: A Path Forward.*[3]  He asserts:  "The report is unequivocal; there is no existing research which demonstrates that fingerprint comparison evidence is reliable and valid."  Jones also relies on an unpublished Maryland trial court opinion[4] which, on the basis of the N.R.C. report and testimony from an FBI fingerprint expert, refused to allow prosecution fingerprint evidence on the ground the state had failed to prove the testimony rested on a reliable factual foundation.

The Attorney General responds:  "The [N.R.C.] study appellant cites has not persuaded other courts that it established any change in the opinion of the scientific community or warranted exclusion of latent fingerprint evidence.  Appellant's out-of-jurisdiction legal authority is unpersuasive and not even good law in its own jurisdiction."

We find the Attorney General's position more persuasive.  The unpublished Maryland case relied on by Jones, *Maryland v. Rose* (2007 Md. Cir.Ct. LEXIS 14), was implicitly disapproved two years later by *Markham v. State* (2009 Md.App.) 984 A.2d 262, which affirmed a trial court's refusal to hold a hearing on the

---

[3]      See National Research Council, "Strengthening Forensic Science in the United States:  A Path Forward (2009)" https://www.ncjrs.gov/pdffiles1/njj/grants/228091.pdf (as of Sept. 17, 2013).

[4]      The California Rules of Court only prohibit the citation of unpublished California cases.  As we noted in *Haligowski v. Superior Court* (2011) 200 Cal.App.4th 983, 990, fn. 4:  "Unpublished federal opinions are ' "citable notwithstanding California Rules of Court, rule [8.1115] which only bars citation of unpublished *California* opinions." ' "  "In California an unpublished opinion may not be cited or relied upon.  [Citations.]  However this rule applies only to opinions originating in California.  Opinions from other jurisdictions can be cited without regard to their publication status.  Decisions of the courts of other states are only regarded as 'persuasive . . . depending on the point involved' [citation], and some states have different publication criteria than California."  (*Lebrilla v. Farmers Group, Inc*. (2004) 119 Cal.App.4th 1070, 1077.)

6

reliability of fingerprint identification evidence.[5] *Markham* said: "*Given the consensus that fingerprint identification is reliable, other courts recently have reaffirmed Maryland's view that a court can take judicial notice of the reliability of fingerprint identification evidence.* See *United States v. Crisp*, 324 F.3d 261, 269 (4th Cir.2003) (because Crisp has 'provided no reason today to believe that this general adoption of the principles underlying fingerprint identification has, for decades, been misplaced,' the district court properly accepted 'at face value' the consensus that the technique is reliable) . . . ; *State v. Escobido–Ortiz*, 109 Hawai'i 359, 126 P.3d 402, 413 (2005) ('We take judicial notice, based on the overwhelming caselaw from other jurisdictions, that the theory underlying latent fingerprint identification is valid and that the procedures used in identifying latent fingerprints, if performed properly, have been widely accepted as reliable.'); *Florence v. Commonwealth*, 120 S.W.3d 699, 702 (Ky. 2003) (fingerprint analysis included among types of scientific evidence for which trial judges can take judicial notice that they 'have achieved the status of scientific reliability')." (*Markham v. State, supra,* 984 A.2d at p. 274, italics added.)

More recently, the Florida Supreme Court in a death penalty case, *Johnston v. State* (Fla. 2010) 27 So.3d 11, denied a request for post-conviction relief predicated on the N.R.C. report's discussion of fingerprint evidence: "[W]e conclude that the report lacks the specificity that would justify a conclusion that it provides a basis to find the forensic evidence admitted at trial to be infirm or faulty. The following statement in the report's executive summary is particularly telling: 'The committee decided early in its work that it would not be feasible to develop a detailed evaluation of each discipline in terms of its scientific underpinning, level

---

[5] *Markham* stated: "Appellant has cited to no reported case, in Maryland or otherwise, finding that fingerprint evidence is not reliable." (*Markham v. State, supra,* 984 A.2d at p. 274, fn. omitted.) "Appellant's sole citation is to a circuit court decision excluding fingerprint evidence." (*Id*. at p. 274, fn. 7.) This circuit court decision was apparently the *Rose* case relied on by Jones.

7

of development, and ability to provide evidence to address the major types of questions raised in criminal prosecutions and civil litigation.' " (*Id*. at p. 21.)

The fact there may now exist some scholarly criticism of forensic fingerprint analysis does not demonstrate there has been a change in the scientific community's long-standing view that the technique is reliable. We conclude the *Kelly-Frye* rule does not apply to this case and that the trial court did not abuse its discretion by admitting the fingerprint evidence.

b. *No prejudice in any event*.

In any event, we conclude any error in admitting the fingerprint evidence was harmless. The erroneous admission of scientific analysis evidence requires reversal only if it is reasonably probable the verdict would have been more favorable to the defendant in the absence of the error. (See *People v. Venegas* (1998) 18 Cal.4th 47, 93 ["Erroneous admission of the results of the FBI's DNA analysis using the modified ceiling approach with floating bins that were too narrow requires reversal only if it is reasonably probable the verdict would have been more favorable to defendant in the absence of the error [under *Watson*[6]]."].) Here, there is no reasonable probability of a different result.

Jones did not put on any evidence. Alfonso told police Jones had asked Alfonso's nephews to participate in the clothing store robbery with him, but that they refused. Arthur confirmed this story and also told police that two days later he overheard Jones talking about his involvement in the crime. Jones argues this evidence should be discounted because it came from witnesses who could have been viewed as accomplices. Not so; neither Alfonso nor Arthur was an accomplice.

"An accomplice's testimony is not sufficient to support a conviction unless it is corroborated by other evidence connecting the defendant with the commission of the offense. [Citation.] In this context, 'testimony' includes an accomplice's out-

---

[6]    *People v. Watson* (1956) 46 Cal.2d 818.

8

of-court statements made under questioning by police or under other suspect circumstances. [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 190-191.) " '[A]n accomplice is one who aids or promotes the perpetrator's crime with knowledge of the perpetrator's unlawful purpose *and* an intent to assist in the commission of the target crime. . . .' [Citation.] 'In order to be an accomplice, the witness must be chargeable with the crime as a principal (§ 31) and not merely as an accessory after the fact (§§ 32, 33).' [Citation.]" (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1353.) "The court need give such instructions only where there is substantial evidence that the witness was an accomplice" (*People v. Boyer* (2006) 38 Cal.4th 412, 466), which does not include mere speculation. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1173 ["Only through bare speculation could the jury have concluded that Devine was guilty of the charged offenses as an accomplice."].)

There was no evidence Alfonso and Arthur were accomplices. Jones's assertion that Arthur was an accomplice is based on a misreading of the record. Jones claims Alfonso told police his nephews carried out the robbery with Jones, but what Alfonso actually said was that, although his nephews were associates of Jones, they had refused to take part in the robbery and they did not accompany Jones to the store that day.

Hence, Jones's guilt did not depend entirely on the fingerprint evidence. Rather, there was strong independent evidence tying Jones to the crime. Therefore, even had the expert been required to testify he could not say the latent prints belonged to Jones "to the exclusion of all other people," it is not reasonably probable the verdict would have been more favorable to Jones.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.